UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JERRY HOOKS,<br><br>　　　　　　　　　　Plaintiff,<br><br>　v.<br><br>BRUCE BANNISTER, et. al.,<br><br>　　　　　　　　　　Defendants. | 3:12-cv-00682-RCJ-WGC<br><br>**REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE**<br><br>Re: Doc. # 75 |

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is Defendants' Motion for Summary Judgment. (Doc. # 75.)[1] Plaintiff filed a response (Doc. # 141) and Defendants filed a reply (Doc. # 144). Plaintiff also filed a sur-reply. (Doc. # 147.)

After a thorough review, the court recommends that Defendants' motion be granted.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., Doc. # 14.) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison (ESP). (*Id*.) Defendants are Dr. Michael Koehn, Angela Gregerson, Gail Holmes, Steven Smith, Bruce Bannister, Harold Byrne, James Cox, Boss, Renee Baker, Sheryl Foster, and Michael Cruse. (Screening Order, Doc. # 35.)[2]

---

[1] Refers to court's docket number.

[2] Service was never accepted on behalf of Boss and it does not appear that Plaintiff has served him to date; therefore, the court will recommend that the District Judge issue a notice of intent to dismiss pursuant to Federal Rule of Civil Procedure 4(m) for failure to serve Boss within 120 days of filing the amended complaint. Defendants' motion was also filed on behalf of Ronald Bryant, Glenn Dolezal, Mark Drain, David Godoy, and Calvin Peck; however, the screening order did not allow Plaintiff to proceed with any claims against these defendants.

Plaintiff was allowed to proceed with Eighth Amendment deliberate indifference to serious medical needs claims against Dr. Koehn, Gregerson, Holmes, Smith, Bannister, Byrne, Cox, Boss, Baker and Foster, as well as retaliation claims against Dr. Koehn, Gregerson and Holmes asserted in Counts III, VII and IX, based on the following allegations:

Plaintiff claims that Dr. Koehn confiscated his "keep-on-person" (KOP) medications, including those for hypertension and severe, chronic back disorders and threatened to discontinue all of his medications if he "continu[ed] to play lawyer." Nurses Gregerson and Holmes allegedly failed to administer one part of Plaintiff's drug regimen or another in retaliation for his lawsuit. Plaintiff suffered heart palpitations, headaches and chest pain as a result. Boss allegedly ignored an emergency grievance of which he was aware for three hours while Plaintiff gasped for breath and suffered chest pain. Plaintiff asserts he was finally taken to the infirmary and admitted and treated for ten days for an irregular heart rhythm. Nursing Assistant Steve Smith allegedly conspired with his supervisors to discontinue Plaintiff's treatment. Plaintiff claims he suffered chest pain, headaches, and severe anxiety attacks for two months. Defendants Baker, Foster, Byrne, and Bannister allegedly denied grievances about the lack of treatment. Plaintiff also alleges that Dr. Koehn later discontinued heart medications and let Plaintiff suffer with agonizing tooth pain for thirty days. Dr. Koehn ordered officers to confiscate all Plaintiff's prescriptions and had him placed in an isolation cell for a day; then later discontinued Plaintiff's medications for two months, and then six months later discontinued his medications for another two months causing chest pain and anxiety. He alleges that Baker, Bannister and Cox denied his grievances about the discontinuation of his medications. (Doc. # 35 at 8-11.)

Plaintiff was also allowed to proceed with a retaliation claim against Cruse in Count V based on the allegation that Cruse prevented Plaintiff from getting certain personal property when he was transferred to ESP, in retaliation for his litigation. (Doc. # 35 at 13.)

Defendants now move for summary judgment as to each of Plaintiff's claims. (Doc. # 75.) Plaintiff's opposition and sur-reply are difficult to decipher, referring to allegations and claims that were dismissed on screening as well as unrelated events and facts, with undue

emphasis placed on prison regulations, procedures and directives, instead of on the facts pertinent to his claims. Where the court could discern the basis for Plaintiff's argument, it is discussed in the court's analysis.

## II. SUMMARY JUDGMENT STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

That being said,

> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249-50 (citations omitted).

### III. DISCUSSION

**A. Legal Standards**

**1. Eighth Amendment Deliberate Indifference**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition

1  that significantly affects an individual's daily activities; or the existence of chronic and
2  substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131
3  (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was
4  wired shut for several months demonstrated a serious medical need).

5  If the medical need is "serious," the plaintiff must show that the defendant acted with
6  deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation
7  omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,
8  1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or
9  even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action
10 under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present
11 when a prison official "knows of and disregards an excessive risk to inmate health or safety; the
12 official must both be aware of the facts from which the inference could be drawn that a
13 substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*,
14 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

15 Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally
16 interfere[s] with medical treatment, or it may be shown by the way in which prison officials
17 provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal
18 quotation marks and citation omitted).  "'[A] prisoner need not prove that he was completely
19 denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*,
20 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other*
21 *grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving medical
22 treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*,
23 974 F.2d at 1060.

24 "A difference of opinion between a physician and the prisoner—or between medical
25 professionals—concerning what medical care is appropriate does not amount to deliberate
26 indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).
27 Instead, to establish deliberate indifference in the context of a difference of opinion between a
28 physician and the prisoner or between medical providers, the prisoner "'must show that the

course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

### 2. Retaliation

A retaliation claim under section 1983 has five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (citations omitted); *see also Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009). Retaliation claims must be evaluated in light of the deference that must be accorded to prison officials. *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

**B. Eighth Amendment Deliberate Indifference-Dr. Koehn-Confiscation of Plaintiff's KOP medications in February 2011**

Dr. Koehn contends that he confiscated Plaintiff's KOP medications on February 10, 2011, because Plaintiff was suspected of abusing his prescription medications. (Doc. # 75 at 8; Doc. # 78-1, Koehn Decl. ¶ 11.) In addition, he argues that Plaintiff was still administered all prescribed medication immediately following the confiscation, he was only required to get them from ESP medical at pill call rather than via self-administration. (*Id*. at 8-9; Doc. # 78-4, Medication Administration Record, February through April 2011 at 1-4.)

On February 2, 2011, Dr. Koehn noted in Plaintiff's progress report that Plaintiff was informed he was on Metoprolol in the amount of 150 mg per day, not 1500 mg as he indicated he was taking in his January 30, 2011 medical kite. (Doc. # 75 at 9; Koehn Decl., Doc. # 78-1 ¶¶ 16-17; Doc. # 78-7, Jan. 30, 2011 kite; Doc. # 78-3 at 32-33, Progress Notes.) Plaintiff's January 30, 2011 kite stated that his dose had been increased to 1500 mg, and mentioned an increase "of nearly eight (8) pills per day." (Doc. # 78-7 at 2, Jan. 30, 2011 kite.)

Dr. Koehn was concerned Plaintiff was abusing his Metoprolol prescription. (Koehn Decl., Doc. # 78-1 ¶¶ 16-17.) Therefore, Dr. Koehn ordered Plaintiff to no-keep-on-person (NKOP) status for his prescription medications and had his KOP prescription medications

- 7 -

1  confiscated pursuant to NDOC AR 635.01(2). (Koehn Decl., Doc. # 78-1 ¶¶ 11, 16; Physician's
2  Orders, Doc. # 78-2 at 16.) That day, Dr. Koehn saw Plaintiff and Dr. Koehn ordered Plaintiff's
3  prescription for Metoprolol with the indication it was to be NKOP. (Physician's Orders, Doc. #
4  78-2 at 16.) He ordered blood pressure checks three times a week, and Plaintiff was given
5  Tolnaftate cream, Selenium shampoo and Oyst-Cal-D on a KOP basis. (*Id.*) He was also
6  scheduled for a visit with Dr. Mar. (*Id.*)
7        On February 2, 2011, Dr. Koehn also instructed that Plaintiff be issued side effect
8  profiles for Naprosyn and all cardiac medications. (Doc. # 78-3 at 32-33, Progress Notes.) On
9  February 4, 2011, Plaintiff was informed of the side-effects of Naprosyn. (Koehn Decl., Doc.
10  # 78-1 ¶¶ 13-14.) Dr. Koehn also informed Plaintiff that his refusal to sign DOC Form 2523
11  would result in termination of his Naprosyn. (*Id.;* Doc. # 78-3 at 32-33, Progress Notes; Doc.
12  # 75-4, Form 2523.) Nursing staff noted Plaintiff refused to sign DOC Form 2523. (Doc. # 78-3
13  at 32, Progress Notes.) On February 4, 2011, Dr. Koehn ordered Plaintiff's prescription for
14  Naprosyn to be discontinued due to his refusal to execute NDOC form 2523, which is a liability
15  release form acknowledging that he understood the risk of gastric bleeding, among other side
16  effects associated with long term use of Non-Steroidal Anti-Inflammatory drugs such as
17  Naprosyn. (Koehn Decl., Doc. # 78-1 ¶¶ 13, 15; Physician's Orders, Doc. # 78-2 at 15; Doc.
18  # 78-3 at 32, Progress Notes.)
19        On February 5, 2011, Plaintiff was admitted to the infirmary. (Doc. # 78-3 at 32, Progress
20  Notes.) On February 6, 2011, he complained of some breathing issues while lying down but no
21  pain at that time. (Doc. # 78-3 at 31, Progress Notes.) He was described as being in no acute
22  distress and there were instructions to continue monitoring, including monitoring his blood
23  pressure. (*Id*.)
24        Plaintiff was discharged on February 10, 2011, with a comment regarding "adaptation to
25  BP meds." (Physician's Orders, Doc. # 78-2 at 14.) He was prescribed various medications,
26  which were NKOP except for Selenium shampoo, hemorrhoid cream, and Tolnaftate cream,
27  which were KOP. (Physician's Orders, Doc. # 78-2 at 14.) On February 7, 2011, he stated he was
28  concerned about recent blood pressure and was reassured that it had improved from earlier. (Doc.

1  # 78-3 at 31, Progress Notes.) He showed no indication of acute distress. (*Id*.) Dr. Koehn stated
2  that if his blood pressure remained elevated he should start a new medication. (*Id*.)
3  　　　　On February 8, 2011, he was noted as sleeping well and taking medications without
4  difficulty. (Doc. # 78-3 at 30, Progress Notes.) He reported no acute issues but said he had
5  occasional chest pain, but his blood pressure was currently under control. (Doc. # 78-3 at 30,
6  Progress Notes.) An EKG was ordered and he was to continue to be monitored. (*Id.*) On
7  February 9, 2011, he had no complaints of chest pain, and Dr. Koehn ordered Plaintiff's
8  Selenium shampoo and hemorrhoid cream. (Physician's Orders, Doc. # 78-2 at 14; Doc. # 78-3
9  at 30, Progress Notes.) On February 10, 2011, Plaintiff was given his medications at pill call, and
10 would not take them while the nurse waited for him. (Doc. # 78-3 at 29, Progress Notes.) On
11 February 11, 2011, Plaintiff refused to take some of his medications. (Doc. # 78-3 at 29, Progress
12 Notes.) On February 23, 2010, blood pressure checks were ordered weekly for four weeks, as
13 well as other medications. (Physician's Orders, Doc. # 78-2 at 13.)
14 　　　　While Plaintiff argues about the veracity of Dr. Koehn's statement that he was concerned
15 Plaintiff was abusing his medication when he sent a kite stating that he was taking 1500 mg of
16 Metoprolol instead of 150 mg (Doc. # 141 at 2, 4), there is no evidence submitted to dispute that
17 he did in fact receive his medications on NKOP status and continued to be monitored and treated
18 by ESP medical staff. Moreover, Dr. Koehn provides the explanation that Plaintiff's Naprosyn
19 prescription was discontinued when Plaintiff refused staff requests to sign NDOC form 2523,
20 acknowledging the risks associated with long term use of Non-Steroidal Anti-Inflammatory
21 drugs such as Naprosyn. Even when this was discontinued, Plaintiff continued to be monitored.
22 Plaintiff provides no evidence to rebut the explanation by Dr. Koehn. The court finds that
23 Dr. Koehn's conduct does not amount to deliberate indifference as there is no evidence that
24 Dr. Koehn knew of and disregarded an excessive risk to Plaintiff's health when he switched his
25 medications to NKOP or when his Naprosyn prescription was discontinued when Plaintiff would
26 not sign Form 2523, and when Plaintiff himself raised the issue of Naprosyn side effects on
27 patients with blood pressure issues. (*See* Doc. # 75-10 at 15, 18, 30.)
28 ///

**C. Eighth Amendment Deliberate Indifference-Dr. Koehn-Cardiologist Consult in February 2013**

Plaintiff sent kites on March 13 and 15, 2013, requesting a cardiology consultation. (Doc. # 78-12, Mar. 13 and 15, 2013 kites.) Plaintiff was assessed on March 15, 2013 and again on March 29, 2013. (Doc. # 78-3 at 6, Progress Notes of Mar. 15 and 29, 2013.) He reported occasional palpitations. (*Id.*) He had a regular heart rate and rhythm. (*Id.*) He was informed to kite as necessary. (*Id.*)

The court cannot conclude that Dr. Koehn's decision to forego a cardiology consultation under these circumstances amounted to deliberate indifference. That is to say, Dr. Koehn did not knowingly disregard an excessive risk to Plaintiff's health. Instead, he evaluated Plaintiff's complaints and determined a referral to a cardiologist was not warranted, and instructed Plaintiff to kite as necessary for further care. Plaintiff has presented no evidence that this decision was medically unacceptable or in conscious disregard of an excessive risk to Plaintiff's health. Therefore, Dr. Koehn should be granted summary judgment as to this claim.

**D. Eighth Amendment Deliberate Indifference-Dr. Koehn-Dental Pain**

Dr. Koehn argues that he is not responsible for dental treatment as he handles medical treatment for inmates. (Koehn Decl., Doc. # 78-1 ¶ 2.) AR 631 governs inmate dental services which are scheduled by the director of nursing in conjunction with the institutional dentist. (Doc. # 75-9, AR 631.) Dental service may be requested by an inmate by filling out a kite. (*Id.*) When inmates are examined they are assessed to determine whether they should receive immediate treatment on an emergency basis or appointment using the priority system. (*Id.*)

Plaintiff kited dental regarding his teeth on January 11, 2013 and was seen by a dental care provider. (Doc. # 78-9 at 1, Jan. 11, 2013 kite.) He kited dental again on January 30, 2013, and complained no action was taken by Dr. Koehn. (Doc. # 78-9 at 2, Jan. 30, 2013 kite.) The response to that kite indicated that Plaintiff had a chipped tooth and suffered no pain. (*Id.*) Plaintiff submitted another dental kite on February 14, 2013, stating that his "tooth sensitivity/ache" had recurred, and asked to try what the dentist discussed with him. (*Id.* at 3.) He submitted another kite to medical (not dental) on February 27, 2013, where he complained

1  Dr. Koehn accused him of malingering, and said his pain was excruciating. (*Id*. at 4.) He was
2  instructed to kite dental directly. (*Id*.) On March 20, 2013, Plaintiff's number 30 tooth was
3  extracted, and it was noted Plaintiff already had Tylenol. (Doc. # 99-1.)

4  The court agrees that Dr. Koehn is not responsible for Plaintiff's dental care at ESP. The
5  evidence demonstrates that he is a physician, and not a dentist at ESP. While he reviews and
6  responds to medical kites, he does not provide dental care or schedule dental appointments.
7  Therefore, Dr. Koehn should be granted summary judgment on this claim.

**E. Eighth Amendment Deliberate Indifference- Dr. Koehn and Smith-Discontinuance of Medications in April 2011**

According to Defendants, ESP has a policy, set forth in Operational Procedure (OP) 609, governing medication management, which states that medications will not be handed directly to inmates, and after an inmate takes medication the inmate shall step back and allow staff to verify the consumption of medications by the inmate doing a "full mouth finger sweep." (Doc. # 75-3, OP 609(2).) In addition, NDOC Medical Directive 507 states that a medication order will be considered for discontinuation when an inmate refuses to take medication for three consecutive days, and the inmate is notified of the decision and it is discussed at a medical visit. (Doc. # 75-6, Medical Directive 507.)

Defendant Smith reported in Plaintiff's progress notes that for three consecutive days, April 10-12, 2011, Plaintiff refused to allow mouth checks at pill call. (Koehn Decl.; Doc. # 78-1 ¶ 19; Doc. # 78-03 at 26, Progress Notes April 10-12, 2011.) As a result, on April 13, 2011, Dr. Koehn documented non-compliance with administration of prescription medication and discontinued Plaintiff's medication in accordance with Medical Directive 507(6). (Koehn Decl., Doc. # 78-1 ¶ 19; Doc. # 78-3 at 26, Progress Notes.) This determination was made to prevent Plaintiff from overdosing and to prevent him from giving his medication to other inmates, as it was possible Plaintiff was "cheeking" his medications and stockpiling them. (Koehn Decl., Doc. # 78-1 ¶ 19.)

Progress notes show Plaintiff's blood pressure continued to be monitored while his medication was discontinued from April 13, 2011 to August 5, 2011, and during this time period

1  he was not referred to the infirmary based on concern for his medical condition. (Koehn Decl.,
2  Doc. # 78-1 ¶ 20; Physician's Orders, Doc. # 78-2 at 12; Doc. # 78-3, Progress Notes.)
3      On May 10, 2011, blood pressure checks were ordered. (Physician's Orders, Doc. # 78-2
4  at 12.) Nursing staff attempted to see Plaintiff on May 18 and 24, 2011, regarding his medication
5  regimen but he became argumentative and the visit was terminated. (Doc. # 78-3 at 25, Progress
6  Notes.)
7      On June 16, 2011, he was referred to be seen by Dr. Mar in August 2011. (Physician's
8  Orders, Doc. # 78-2 at 11.) On July 8, 2011, Plaintiff was seen by medical regarding his June 28,
9  2011 kite concerning daily headaches and was issued a prescription for Excedrin Migraine
10 (KOP). (Physician's Orders, Doc. # 78-2 at 11; Doc. # 78-8, June 27, 2011 kite; Doc. # 78-3 at
11 24, Progress Notes.) He denied chest pain, tightness or pressure at this examination. (Doc. # 78-3
12 at 24, Progress Notes.) He had a regular heart rate and rhythm. (*Id.*) An EKG was ordered as
13 were three times a week blood pressure checks for two weeks, enrollment in the C-Clinic as well
14 as other medications. (Physician's Orders, Doc. # 78-2 at 11; Doc. # 78-3 at 24, Progress Notes.)
15 His blood pressure was monitored for the rest of the month. (*Id.*)
16     On August 5, 2011, his Metoprolol prescription was renewed but on NKOP status, and
17 blood pressure checks were ordered for three times a week for two weeks. (Physician's Orders,
18 Doc. # 78-2 at 11.)
19     Plaintiff disputes that there was sufficient evidence that he was "cheeking" or
20 "stockpiling" his medication. Regardless of whether Plaintiff was in fact doing this, Dr. Koehn
21 made a decision to discontinue Plaintiff's medications because there was a possibility this was
22 the case. More importantly, Plaintiff's medical records demonstrate that even when he was
23 without this medication, he was under close monitoring and he did not submit kites or complaints
24 about blood pressure or heart-related issues. In addition, Smith's only action was in documenting
25 Plaintiff's refuse to participate in "mouth checks." Therefore, it cannot be said that Dr. Koehn or
26 Smith knew of and disregarded an excessive risk to Plaintiff's health. As a result, they should be
27 granted summary judgment on this claim.
28

**F. Eighth Amendment Deliberate Indifference- Dr. Koehn and Smith-Confiscation of Plaintiff's Medications in February 2013**

Plaintiff alleges that between February 2, 2013 and February 11, 2013, Dr. Koehn and Smith confiscated his prescribed medication regimen.

On February 4, 2013, Dr. Koehn ordered Plaintiff to be taken off KOP status for all physician ordered medications, and ordered blood pressure checks three times a week for two weeks. (Koehn Decl., Doc. # 78-1 ¶ 21; Physician's Orders on February 4, 2013, Doc. # 78-2 at 4.) According to Plaintiff's medical records, he did continue to receive his prescribed medications, just not on a KOP basis. (Doc. # 78-2 at 3-4 (Elavil renewed on Feb. 27, 2013 (NKOP), Verapamil renewed for one year on April 9, 2013 (NKOP), Lisinopril renewed for one year on April 12, 2013 (NKOP), EKG/cardiac panel lab scheduled April 16, 2013, prescribed Tolnaftate cream KOP on February 27, 2013.) EKGs and laboratory tests continued to be performed. (*Id*. at 2.) His blood pressure continued to be monitored throughout the month. (*Id*.)

Plaintiff's medical records reveal that Plaintiff was merely taken off KOP status for his medications, and he continued to have his blood pressure monitored in February 2013. (Doc. # 78-6, Pl.'s Med. Admin. Records for Feb. 2013; Doc. # 78-3, Pl.'s Progress Notes for Feb. 2013; Doc. # 78-2, Pl.'s Physicians' Orders, February 4, 2013.) Plaintiff still received his medication at pill call. (*Id*.) It cannot be said that Dr. Koehn or Smith knew of and disregard an excessive risk to Plaintiff's health in requiring that he receive his medications at pill call instead of by self-administration. Therefore, they should be granted summary judgment on this claim.

**G. Eighth Amendment Deliberate Indifference- Gregerson and Holmes**

**1. Holmes-Failure to Exhaust**

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is "'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007), *cert. denied*, 135 S.Ct. 403 (Oct. 20, 2014)). Unless the failure to exhaust is clear from the face of the complaint, the defense must be raised in a motion for summary judgment. *See id.* (*overruling in part Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003) which stated that failure to exhaust should be raised in an "unenumerated Rule 12(b) motion").[3]

As such: "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [in a preliminary proceeding]." *Id.*, 1168, 1170-71 (citations omitted). "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim. If discovery is appropriate, the district court may in its discretion limit discovery to evidence concerning exhaustion, leaving until later—if it becomes necessary—discovery related to the merits of the suit." *Id.* at 1170 (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). If there are disputed factual questions, they "should be decided at the very beginning of the litigation." *Id.* at 1171.

Once a defendant shows that the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)). The ultimate burden of proof, however, remains with the defendant. *Id.*

---

[3] If, on the other hand, the failure to exhaust is clear from the face of the complaint, the defendant may raise the defense in a motion to dismiss under Rule 12(b)(6). *See id.*, 1169. "[S]uch cases will be rare because a plaintiff is not required to say anything about exhaustion in his complaint." *Id.* at 1169

1    If the court concludes that administrative remedies have not been properly exhausted, the
2 unexhausted claim(s) should be dismissed without prejudice. *Wyatt*, 315 F.3d at 1120, *overruled*
3 *on other grounds by Albino*, 747 F.3d 1162.
4    NDOC's grievance process is set forth in AR 740 and consists of various levels: first, the
5 inmate is supposed to resolve the grieved issue "informally", and if an informal resolution is not
6 achieved, then the inmate must complete an informal level grievance, and then must proceed
7 through the first and second levels if he is dissatisfied with the response to the prior level
8 grievance. (Doc. # 75-7.)
9    Defendants have submitted evidence demonstrating that Plaintiff did not fully exhaust or
10 even submit a grievance related to Holmes incorrectly administering his medications. (Doc. # 75
11 at 16-19; Ex. P, Byrne Decl. ¶ 10.) Plaintiff has not rebutted Defendants' evidence that he failed
12 to exhaust his administrative remedies with respect to his Eighth Amendment claim against
13 Holmes; therefore, this claim should be dismissed without prejudice at to Holmes.
14    **2. Gregerson**
15    Plaintiff alleges that Gregerson consistently failed to bring one part or another of his
16 medication for nearly four times each month for a two year period. (Doc. # 14 at 6.) Plaintiff's
17 complaint only identifies the date of February 3 without the accompanying year.
18    Defendant Gregerson argues that the grievances responding to Plaintiff's complaints on
19 this issue explained to Plaintiff his medications were delivered correctly and changes in
20 appearance of medications are not uncommon as the pharmacy often changes brands. (Doc. # 75
21 at 19-20; Doc. # 75-11; Doc. # 75-13.) In his second level grievance, 2006-29-55522, Plaintiff
22 acknowledged a change in his medication and stated that Gregerson should have told him as
23 much. (Doc. # 75 at 20; Doc. # 75-13 at 1.) Defendants point out that the informal level response
24 to grievance 2006-29-51310 does indicate that Plaintiff missed a pill in his regimen on one day,
25 October 11, 2012, but a single occurrence of misadministration of medication does not constitute
26 deliberate indifference. (Doc. # 75-12; Ex. X, Pl.'s Admin. Records, Oct. 2012.)
27    There can be no deliberate indifference related to Gregerson's failure to advise Plaintiff
28 of a change in appearance of a medication, because this did not pose a serious risk of harm to

Plaintiff. Moreover, the grievance documentation reveals that Plaintiff had an issue with Gregerson's dispensing of his medication on one occasion, which was promptly addressed. The court agrees with Defendants that a single occurrence of misadministration of medication that was promptly addressed does not rise to the level of deliberate indifference. *See Snow v. McDaniel*, 681 F.3d 978, 990 (9th Cir. 2012) (citation omitted) ("[A] finding that the defendant's neglect of a prisoner's condition was an 'isolated occurrence' or an 'isolated exception' to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference."). Therefore, Gregerson should be granted summary judgment as to this claim.

**H. Eighth Amendment Deliberate Indifference-Baker, Foster, Byrne, Bannister, Cox**

Plaintiff alleges that Baker, Foster, Byrne, Bannister and Cox denied Plaintiff's grievances concerning discontinuance of his medications by Dr. Koehn. The court has found that Dr. Koehn is entitled to summary judgment on these claims. With no underlying Eighth Amendment violation, Plaintiff has no predicate for his claims against these defendants. Therefore, summary judgment should be granted in their favor.

**I. Retaliation-Dr. Koehn**

Plaintiff claims that Dr. Koehn threatened to discontinue Plaintiff's medications if Plaintiff "continued to play lawyer." (Doc. # 14 at 22.) He asserts that on February 2, 2011, he was returned to his cell without being dispensed his prescribed treatment regimen that evening or the following morning "in retaliatory harassment campaign geared at punishment..." (*Id*.) He goes on to allege that on April 11, 2011, defendant Smith "conspired with his superiors" to discontinue Plaintiff's treatment regimen when Smith contended that Plaintiff did not submit to a "mouth check" on several occasions pursuant to OP 609. (*Id*. at 23.) He claims his medications were discontinued for two months. (*Id*.) He avers that "Koehn was in fact carrying out his Feb. 2 threat to see [Plaintiff] punished through subordinate (Smith)..." (*Id*.)

Dr. Koehn argues that there are no facts to link his actions to Plaintiff's exercise of his First Amendment rights. This is because in February 2011, Plaintiff was receiving his medications, just on NKOP status instead of KOP status.

The court finds that there is no evidence to support Plaintiff's retaliation claim against Dr. Koehn. Importantly, the record demonstrates that no adverse action was taken against Plaintiff with respect Dr. Koehn's conduct in February 2011. Dr. Koehn changed Plaintiff's medication delivery status from KOP or self-administration to NKOP or administration by ESP medical staff at pill call. Plaintiff still received his medication. Therefore, the court cannot conclude this rises to the level of *adverse* action. Insofar as Plaintiff alleges that Dr. Koehn retaliated against him when his medications were discontinued as a result of Smith's conclusion that Plaintiff failed to submit to several "mouth checks," there is no evidence in the record to link Smith's conduct in April 2011 to Dr. Koehn's statement in February 2011 that Plaintiff "continued to play lawyer" and what Plaintiff alleges was Dr. Koehn's plan to deprive him of his medication. As a result, Dr. Koehn should be granted summary judgment as to this claim.

**J. Retaliation-Gregerson and Holmes**

According to Defendants, a review of Plaintiff's grievance file reveals five grievances where Plaintiff alleged complaints against Nurse Gregerson, and only one of those alleged retaliation (grievance 2006-29-55467), but that grievance was abandoned at the informal level. (Byrne Decl., Doc. # 75-8 ¶ 9; Doc. # 75-17.) There was no grievance filed against Nurse Holmes. (*Id.* ¶ 10.)

The court has reviewed all of the documentation, and even if grievance 2006-29-57302 (Doc. # 75-11) could be characterized as raising a retaliation issue, which is a stretch, there is no evidence that Gregerson's alleged conduct is linked to Plaintiff's ability to exercise a constitutional right, other than Plaintiff's mere speculation that is the case, which is insufficient to create a genuine dispute of material fact. *See Pratt*, 65 F.3d at 806-07; *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). Therefore, Gregerson is entitled to summary judgment on this count.

There are no grievances putting NDOC on notice of the retaliation claim against Holmes; therefore, this claim should be dismissed without prejudice as to Holmes.

///

///

**K. Retaliation-Cruse**

Plaintiff alleges that Cruse prevented Plaintiff's personal pajama set from being transported from his prior housing assignment at Nevada State Prison to ESP in retaliation for an investigation regarding a prior retaliation claim made by Plaintiff. (Doc. # 14 at 29.)

Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim against Cruse. (Doc. # 75 at 28.) Plaintiff filed two grievances related to his pajamas and defendant Cruse, but both stopped at the informal level. (*Id.,* citing Docs. # 75-14, # 75-15, # 75-16.)

In light of the evidence submitted by Defendants, and Plaintiff's failure to come forward with any evidence that administrative remedies were unavailable to him, the court concludes that Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim against Cruse and this claim should be dismissed without prejudice.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment (Doc. # 75) as follows: summary judgment should be granted as to all claims except for the following, which should be dismissed without prejudice as a result of Plaintiff's failure to exhaust his administrative remedies: the Eighth Amendment and retaliation claims against Holmes and the retaliation claim against Cruse.

**IT IS HEREBY FURTHER RECOMMENDED** that the District Judge issue a notice of intent to dismiss defendant Boss pursuant to Federal Rule of Civil Procedure 4(m) for failure to serve Boss within 120 days of filing the amended complaint.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

      2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED:  June 29, 2015.

                                                  _____
                                                  WILLIAM G. COBB
                                                  UNITED STATES MAGISTRATE JUDGE